# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5004 | **DATE** | 11/14/2003 |
| **CASE TITLE** | Armando Lopez vs. Micro Center Sales Corp. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Micro Center's motion for summary judgment is granted and this action is dismissed. (28-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | |
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | | NOV 17 2003 | |
| | Notified counsel by telephone. | | | date docketed | 47 |
| ✓ | Docketing to mail notices. | | | | |
| ✓ | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | | date mailed notice | |
| SN | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials | |

DOCKETED

NOV 1 7 2003

ARMANDO A. LOPEZ,                    )
                                     )
                 Plaintiff,          )
                                     )
    v.                               )      No.  02 C 5004
                                     )
MICRO CENTER SALES CORPORATION,      )
etc.,                                )
                                     )
                 Defendant.          )

<u>MEMORANDUM OPINION AND ORDER</u>

Armando Lopez ("Lopez") has sued his former employer Micro

Center Sales Corporation ("Micro Center"), asserting that Micro

Center discriminated against him in violation of Title VII of the

Civil Rights Act of 1964 ("Title VII," 42 U.S.C. §§2000e) when it

terminated his employment because of his race or national origin

or both.  Micro Center has moved for summary judgment pursuant to

Fed. R. Civ. P. ("Rule") 56, and both sides have (at least

nominally) complied with this District Court's LR 56.1.[1]  Because

Lopez has not raised a genuine issue of material fact suggesting

that his termination was a function of his status either as

Hispanic or as Mexican, Micro Center's motion for summary

---

[1]  LR 56.1 requires parties to submit evidentiary statements
and responses to such statements to highlight which facts are
disputed and which facts are agreed upon.  This opinion cites to
Micro Center's LR 56.1 statement as "MC. St. ¶--," to Lopez' LR
56.1 statement as "L. St. ¶--" and to each party's response as
"MC. Resp. ¶--" or "L. Resp. ¶--."  Where an assertion in either
party's LR 56.1 statement is undisputed by the opponent, the
opinion includes only a citation to the original statement.  "L."
and "MC." designa-tions are also used in referring to all other
documents submitted by the parties.

47

judgment is granted and this action is dismissed.

Summary Judgment Standard

To succeed on a summary judgment motion, the movant bears the burden of establishing there is no genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, (477 U.S. 317, 322-23 (1986)). In making that determination, a court considers the evidentiary record in the light most favorable to the nonmovant and draws all reasonable inferences in its favor (<u>Lesch v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir. 2002)). But the nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (<u>Pugh v. City of Attica</u>, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (id.). Summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

Both parties suggest in their supporting memoranda that Lopez' case is quite straightforward. That might fairly be said of Micro Center's presentation, but Lopez' response has unfortunately muddied the waters a good deal.[2] Even if Lopez'

---

[2] In that respect, a material part of the difficulty in distilling the facts comes from Lopez' consistent failure to provide an accurate guide through the evidence. Thus Lopez' counsel repeatedly refers to incorrect or non-existent paragraphs of his LR 56.1 statement (see, e.g., L. Mem. 5) and often directs this Court to supposed evidence that has not in fact been provided (id.). No court has the resources (nor should it be

2

claims were to be viewed as straightforward in the legal sense (a somewhat doubtful premise, given the changes in the employment discrimination landscape foreshadowed by <u>Desert Palace, Inc. v. Costa</u>, 124 S.Ct. 2148 (2003)), it is still necessary to clear those waters in terms of the facts to which the legal principles apply. Those facts are of course viewed in the light most favorable to nonmovant Lopez-- but within the limitations created by the extent of his compliance (or noncompliance) with the strictures of LR 56.[3]

## Facts

Beginning in 1997 Lopez was a sales associate in Micro Center's Chicago retail computer store (MC. St. ¶¶2-3). In February 2002 Micro Center terminated him for assertedly violating its markdown policy by improperly discounting a

_____

required) to fend for itself in sifting through a dense record to piece together a litigant's argument for the litigant. As is often repeated, judges are not compelled to root through a record like a pig hunting for truffles (<u>United States v. Dunkel</u>, 927 F.2d 955, 956 (7th Cir. 1991)(per curiam)).

[3] Because LR 56.1 is intended to transform the record presented to this Court into a manageable series of clearly admitted or disputed facts, it is imperative that each party's response indicate whether it admits or disputes each numbered paragraph of the adversary's statement, supporting any disputes with citations to the record (LR 56.1(b)(3)(A)). Any responses that mistakenly echo the second sentence of Rule 8(b)--which applies only to responsive <u>pleadings</u>--by indicating that a party does not have sufficient information to admit or deny a fact, or any responses that fail to cite to any record evidence to support a dispute, are simply ineffective. All facts that are thus improperly controverted are deemed admitted (<u>McGuire v. United Parcel Serv.</u>, 152 F.3d 673, 675 (7th Cir. 1998)).

computer memory card that Lopez' co-worker Gerald Minzey was attempting to buy (id. ¶¶45, 48-49, 52-54, 57-60).

Micro Center's Employee Handbook prescribes a discretionary progressive discipline system (MC. Ex. 6 at 36). But the Standards of Conduct section of the Handbook (which Lopez acknowledges receiving) warns employees that they may be subject to immediate discharge without moving through the progressive discipline system if they commit one of any number of "very serious" violations, including "willful violation of any company rule or policy" and "unauthorized discounting of merchandise or service" (MC. St. ¶¶9-10, 13).

Micro Center's actual markdown policy, as it relates to employees rather than customers (who benefit from a progressive weekly discounting of returned or clearance merchandise), is at issue in this case. If an employee wants to purchase any such merchandise from the store, the purchasing employee must request that an employee who works in the department that sells that particular item mark down the item physically and specify the discount on a yellow tag placed on the item (MC. St. ¶¶24,33). Each discount amount is determined by a complicated process and must be approved by a supervisor or manager (id. ¶46). Managers (but not sales associates) have discretion to approve additional markdowns in order to reduce the amount of unsold merchandise (id. ¶¶26-28).

In August 2001 Micro Center's home office directed the Chicago store to cease allowing employees to mark down by 50% any returned and clearance merchandise that was then being purchased by other employees (MC. St. ¶31). Under the revised markdown policy, employees can mark down such returned or clearance merchandise only to the same price at which the merchandise would be available to customers (<u>id</u>. ¶32). Alternatively, employees can purchase such returned or clearance merchandise at the employee discount rate that applies to non-clearance merchandise--5% over cost (<u>id</u>. ¶39). Micro Center informed its employees of the changed markdown policy by discussing it at several store meetings and by attaching new "Employee Purchase Guidelines" to each employee's paycheck (<u>id</u>. ¶¶35, 37).

It is against that set of policies that the sequence of events giving rise to Lopez' discharge must be examined. It appears that Gerald Minzey ("Minzey") brought Lopez an item that Minzey wished to purchase, with a yellow tag fully completed except for the price (L. St. ¶37). Lopez then marked down the item to a price of $25.96, about 48% off of the original price (<u>id</u>. ¶39; MC. St. ¶¶48-49). When Minzey filled out his employee purchase form and brought it to Retail Sales Manager Adam Mandel ("Mandel") for approval, Mandel noticed that the purchase price was "extremely abnormal" (MC. St. ¶¶46-47). Mandel asked Minzey to bring the actual item (with the yellow tag on it) to him (<u>id</u>.

¶47). Mandel noted that the yellow tag had been initialed by "AL" (id. ¶49). After questioning Minzey about the yellow tag, Mandel allowed him to purchase the item for the correct amount--20% rather than nearly 50% off of the retail price (id. ¶51). Mandel then began to explore how Lopez and the markdown were connected.

Between January 23, 2002 and Lopez' dismissal about 10 days later, Lopez participated in at least two meetings--one with Mandel and another Manager Joe Centeno ("Centeno"), and another with Micro Center's Director of Loss Prevention Skip Myers ("Myers") and Chicago Operations Manager Jim White ("White") (MC. St. ¶¶52, 56). Over the course of those meetings Lopez told the investigators that he understood that the old policy of allowing employees to discount clearance and returned items for other employees at 50% had been discontinued, that he was familiar with the parameters of the new policy and that he had made a mistake by not following store policy (id. ¶¶57-58). Lopez memorialized some of those acknowledgments in a written statement declaring that he had made a "mistake" by marking down the item (id. ¶¶59).[4]

Based on those conversations, on Lopez' written statement and on further investigation, Micro Center terminated Lopez'

---

[4] Lopez' handwritten statement is difficult to read--and to understand. Each party seems to believe that the statement supports its or his position (MC. St. ¶59, 61; L. Resp. ¶¶54, 57-58). In the interest of clarity, this Court has transcribed the statement verbatim (an undertaking that could have easily been handled by either party) and has attached the transcription as Appendix A to this opinion.

6

employment (MC. St. ¶¶60-61). Minzey was not terminated for his participation in the event that led to Lopez' discharge, and although Micro Center drafted a warning for Minzey regarding his involvement in the incident, the warning was never issued (<u>id</u>. ¶67).

Myers and Micro Center's Director of Human Resources Angela Miller, both from Micro Center's home office, made the ultimate decision to terminate Lopez (MC. St. ¶60; MC. Resp. ¶48). Before arriving at that decision, Miller and Myers gathered information both about the Lopez situation and about previous actions taken in the Chicago store (including at least one firing) for violations of the markdown policy, obtaining that information from several managers and supervisors (Mandel, Centeno, White and General Manager Craig Stiles) ("Stiles"), as well as from Chicago store Human Resources Director Layda Cordoso-Duris ("Cordoso-Duris")(MC. St. ¶¶52, 56, 60, 62; L. Resp. ¶60; MC. Resp. ¶46).

After his termination Lopez filed a timely charge of discrimination with EEOC, based on race or national origin or both, claiming that he was terminated for violating the markdown policy while non-Hispanics and non-Mexicans who violated the policy were not terminated (MC. St. ¶4). After EEOC issued a right to sue letter, Lopez brought this Title VII action (<u>id.</u> ¶5).

## Application of the Rule 56 Standards

Lopez relies solely on the indirect method of proof articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). That approach typically requires an employee first to create a prima facie case of discrimination by demonstrating that (1) he is a member of a protected class[5] (2) who was meeting his employer's legitimate expectations yet still (3) suffered an adverse employment action (4) while other similarly situated employees were treated more favorably (<u>Volovsek v. Wis. Dep't of Agric., Trade & Consumer Prot.</u>, 344 F.3d 680, 692 (7th Cir. 2003)). If employee Lopez succeeds in doing so, the burden of production shifts to Micro Center to articulate a nondiscriminatory legitimate business justification for its conduct (<u>id</u>.). If Micro Center does so in turn, the burden of production shifts back to Lopez (who always has the burden of persuasion, though) to show that discrimination was the real motivation for his termination, most commonly by showing that Micro Center's stated reason is a pretext for discrimination (<u>id</u>.).[6]

---

[5]  "Protected class" may not be the right term, given the existence of other litigation that recognizes concepts of "reverse discrimination." But because the term "protected class" continues to be widely used throughout the jurisprudence, this opinion adheres to that conventional usage.

[6]  It would seem that the <u>McDonnell Douglas</u> formulation may have limited future utility, given the Supreme Court's recent decision that a Title VII mixed motive case may be proved through

8

It is however plain that the conventional McDonnell Douglas

formulation does not fit the situation here, where the "meeting

employer expectations" component of the required prima facie case

is lacking because of Lopez' violation of Micro Center's markdown

policy.[7]  Instead, as is true in every case in which an employee

in a protected class has sustained an adverse employment action

because of some misstep, the issue comes down to whether other

similarly situated employees not in that class were treated more

favorably (Flores v. Preferred Tech. Group, 182 F.3d 512, 515 (7th

Cir. 1999); Volovsek, 344 F.3d at 692).

Micro Center tries to duck that issue by asserting (1) that

----

indirect or circumstantial evidence alone (Desert Palace, 124 S.
Ct. at 2155; Dare v. Wal-Mart Stores, Inc., 267 F.Supp.2d 987,
991-93(D. Minn. 2003)).  But even post-Desert Palace, Volovsek,
344 F.3d at 692 has continued both to draw a distinction between
the indirect and direct methods of proof and to endorse burden-
shifting as a reliable method of arranging the presentation of
evidence in an employment discrimination case.  Because both
parties here have proceeded under McDonnell Douglas, and because
Lopez' circumstantial evidence is inadequate to raise a genuine
issue of material fact under any line of analysis, this opinion
will follow the litigants' lead in employing the McDonnell
Douglas method.

[7]  Micro Center contends that Lopez admitted he violated the
markdown policy both in his written statement at App. A (MC. St.
¶59) and when he assertedly told Myers and White that he "knows
he made a mistake by not following store policy" (id. ¶58).
Although Lopez of course admits writing the statement, he denies
making the comment to Myers and White and generally denies having
admitted that he violated the policy (L. Resp. ¶¶58-59).  But the
real issue is not whether Lopez admitted a policy violation (an
issue as to which, with the benefit of reasonable inferences, he
might perhaps be said to have created a factual issue), but
rather whether he actually violated the markdown policy.  And on
that score there is really no question that he did.

it does not inquire about the race or national origin of any of its employees and (2) that although it was aware Lopez was Hispanic from his own self-identification, the individuals who made the decision to terminate him were not aware he was Mexican. From those assertions Micro Center seeks an inference that it could not have discriminated against Lopez on account of his national origin (MC. St. ¶¶132-33, 143; <u>Monley v. Q Int'l Courier, Inc.</u>, 128 F.Supp.2d 1155, 1160 (N.D. Ill. 2001)). Lopez counters that over the course of his employment the actions of various Micro Center employees indicated an awareness that he was of Mexican descent, information that could readily have been conveyed to the decisionmakers in this case (L. St. ¶¶73-74). Moreover, Lopez suggests that his resume clearly indicated his national origin (<u>id</u>. ¶75). In light of the need to draw all reasonable inferences in Lopez' favor, this opinion proceeds from the premise that he could potentially maintain a case of either race or national origin discrimination.

Other Micro Center employees--non-Hispanic or not of Mexican origin--are similarly situated to Lopez if they are "directly comparable...in all material respects" (<u>Peele v. Country Mut. Ins. Co.</u>, 288 F.3d 319, 330 (7th Cir. 2002)). Lopez bears the burden of showing that the other employees whom he identifies as his "comparables" are in fact sufficiently similarly situated to warrant such a comparison (<u>Peters v. Renaissance Hotel Operating</u>

10

Co., 307 F.3d 535, 546 (7th Cir. 2002)). In the disparate
discipline context, another employee will typically be considered
comparable to a plaintiff if both employees have the same
disciplinary supervisor (in other words, if the decision to
discipline or not to discipline was made by the same person), if
the other employee was subject to the same standards and if the
other employee engaged in the same conduct (or at least engaged
in similar conduct without significant differentiating or
mitigating factors)(Radue v. Kimberly-Clark Corp., 219 F.3d 612,
617-18 (7th Cir. 2000)).

Examination of each of Lopez' potential comparables in those
terms reveals that none of them is sufficiently similarly
situated to Lopez to be helpful to him in creating the required
genuine issue of fact. Those other employees will be looked at
seriatim. Because none of them is Mexican in origin (so that all
are outside of that protected class), each will simply be
identified as Hispanic or non-Hispanic (to indicate whether a
second class difference also exists).

Gerald Minzey

Most obvious among the possibilities raised by Lopez is
Minzey (non-Hispanic), the other participant in the incident that
led to Lopez' dismissal. Lopez claims that because Minzey was
not discharged (or even issued a warning, although one was
drafted regarding the situation (MC. St. ¶67), Minzey is a

11

similarly situated employee who was treated more favorably.

Even though Minzey too was a sales associate, and even
though the decision not to discipline him was also made by Miller
and Myers (L. St. ¶10), he is still not similarly situated to
Lopez, because at the time of the investigation preceding Lopez'
termination Micro Center had no evidence that he had engaged in
conduct similar to Lopez'. Unlike Lopez, who admitted committing
the acts that gave rise to his dismissal (however innocently or
misguidedly he may have admitted or committed them), Minzey
strenuously denied that he had done anything wrong in the
situation and repeated several times that he had followed correct
procedure (MC. Resp. ¶10)--an assertion uncontradicted in the
record. With no evidence that Minzey himself engaged in conduct
at odds with the markdown policy, he cannot be considered as
similarly situated to Lopez for disciplinary purposes.

Raul Hernandez ("Hernandez"), Jeremy Rome ("Rome")
  and Bryan Walston ("Walston")

Lopez said in his deposition testimony that he believes
three other employees violated the markdown policy but were
treated more favorably than he was (MC. St. ¶87). In October
2001 three Micro Center employees--Hernandez (Hispanic), Rome
(non-Hispanic) and Walston (non-Hispanic)--were involved in a
markdown violation incident (id. ¶¶88-90; L. St. ¶13).
Hernandez generated a quote for a product that Walston intended
to purchase, and Rome executed the markdown (MC. St. ¶¶94-97).

12

After Rome admitted responsibility, all three employees received counseling for their actions, but none was terminated (id. ¶¶98-100).

Under the Radue criteria, the situation involving those three employees did not sufficiently parallel Lopez' violation for them to be considered as comparable. Importantly, the policy violation involved was essentially de minimis in nature: the markdown taken was initiated just two days earlier than the policy specified (on a Friday, while the price reduction was due to take effect on Sunday) and the amount of the markdown actually taken was entirely correct in terms of the already-scheduled Sunday reduction, so that Micro Center really suffered no financial loss (MC. St. ¶¶92-93). So the trio was not doing violence to the new markdown policy, as contrasted with Lopez' having followed the old policy (with its much larger permitted markdowns). Moreover, the decisionmakers in the two instances were different: It was managers Mandel and Centeno who decided to give the three employees warnings (rather than to terminate them), without input from anyone at Micro Center's home office (Myers, Miller or anyone else)(id. ¶¶101-02).

Ava Vilchez ("Vilchez")

Lopez also mentions Vilchez (Hispanic) as an employee who violated the markdown policy but was treated more favorably (L. St. ¶19). Cashier Vilchez rang up a purchase for another

employee that gave the purchaser a greater discount than had previously been authorized by management (MC. St. ¶¶106-07, 110). But during the investigation Vilchez told Micro Center that the purchasing employee had handed her a box that she believed was for a printer, not a projector (the item actually being purchased), so that her calculation was based on that misunderstanding (id. ¶¶108-09).[8]

Vilchez is not a comparable employee for two significant reasons (even apart from the fact that she was a cashier and not a sales associate). For one thing, the decision not to terminate her was made by Stiles and Cardoso-Duris without consulting Myers or Miller (MC. St. ¶114). But most importantly, Vilchez' conduct is simply not similar enough to Lopez' to warrant comparison. Vilchez understandably believed she was marking down a product different from the one actually being purchased. Had the product been what Vilchez thought it was, her markdown percentage would have been correct. In contrast, Lopez knew full well the identity of the product he was marking down, but he did so at a no longer permissible percentage. Any of those differences would alone disqualify Vilchez as an appropriate comparable--together

---

[8] While Vilchez was not discharged, the employee who had attempted to purchase the item was (MC. St. ¶104). Hector Zavala (of Mexican origin) admitted that he knew he had been authorized to get a much smaller discount (just half as much) on the item but that he did not correct Vilchez as to her mistake at the register, nor did he correct the error later when another employee pointed it out to him (id. ¶¶106-07, 112-13).

they are of course fatal to Lopez' argument in that respect.

Stiles and Mandel

Lopez next points to Stiles and Mandel (both non-Hispanic).
But Stiles and Mandel are not comparable to Lopez, both because
they were not in "materially parallel positions" (Radue, 219 F.3d
at 618) and because their conduct was substantially different
from his.

First, Lopez was a sales associate while Stiles and Mandel
were managers (MC. St. ¶¶16-17). Those positions are materially
different in terms of the discretion afforded each position.
Significantly, sales associates are not authorized to deviate
from the markdown guidelines, while managers are given discretion
to determine when additional markdowns are appropriate (MC. St.
¶¶27-28)--a discretion that is obviously needed to deal with
special situations that might arise from time to time.

Furthermore, while the violations by Stiles, Mandel and
Lopez all involved the improper marking down of merchandise, both
Stiles and Mandel were cited for abusing their discretion by
authorizing inappropriate markdowns to customers as part of a
promotional sales contest to enhance the sales of service plans.
That violation is entirely different in several ways from the
conduct that led to Lopez' termination (MC. St. ¶118), and Micro
Center was not required to respond with like discipline.

## Isaac Johnson ("Johnson")

Lopez lastly mentions Johnson (African-American) as another employee who was not terminated for his violation of the markdown policy (L. St. ¶16). Johnson sold an item to a customer (who happened to be a former employee) for a penny without first getting manager approval (MC. Resp. ¶16). Although Johnson should have sought such approval before selling the item, the markdown itself was actually authorized by Micro Center policy because it was in furtherance of customer service (id.).

Thus the contrast between Johnson's operation within the parameters of store policy and Lopez' attempted markdown, which was both unauthorized and inconsistent with the new policy, deprives the two situations of sufficient similarity for appropriate comparison. And as with other employees, the decision not to discharge Johnson was made by White and Stiles without input from Miller, Myers or anyone else at the Micro Center home office--a factor that "alone probably precludes a showing of similarity" (Radue, 219 F.3d at 618).

## Other Employees

After Lopez' termination, Minzey conducted his own personal investigation into Micro Center's treatment of other employees who violated the markdown policy (L. St. ¶50). His informal questionnaire revealed that numerous employees of various races and national origins claimed to have marked down merchandise at

16

50% (both before and after the new markdown policy was instituted to replace the previously permitted 50% discount for markdowns), but they were not terminated for their actions (id.).

But that information--classic hearsay--is barred from consideration under Rule 56(e) (Russell v. Acme-Evans Co., 51 F.3d 64, 68 (7th Cir. 1995)). And even were that not the case, the sporadic data in Minzey's poll would require more than reasonable inferences to generate a genuine factual issue as to whether any of those employees bore the required similarity to Lopez' situation.

## Summary

This Court of course recognizes the possible danger of applying the similarly situated requirement as though it meant identically situated, so that a defendant could preclude every potential plaintiff from establishing that element by organizing its workplace so that no single employee is the similarly-situated twin of any other (see Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 353 (6th Cir. 1998); Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993)). But the other side of that coin is that the employer must be given room to make honest business judgments that different kinds of infractions of its rules and policies are to be treated with different degrees of severity.

At the core of his argument, Lopez appears to be asserting

17

that because Micro Center decided not to terminate some employees who violated its policy in other ways, yet terminated Lopez for what it perceived to be his more serious violation of the markdown policy, it has treated him "less favorably" than those other employees whom he characterizes as similarly situated. But that contention is self-defeating, for Micro Center has permissibly reserved to itself the power to discipline its employees along a spectrum as warranted by the circumstances of each situation (MC. St. ¶¶99-100; <u>Anderson v. Stauffer Chem. Co.</u>, 965 F.2d 397, 403 (7th Cir. 1992)). Lopez' own subjective belief that the conduct of some other employees was more serious than his own (and thus merited equally severe treatment) cannot prevail over the system of discretionary discipline that Micro Center has legitimately established (<u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 583 (6th Cir. 1992); <u>Cook</u> , 988 F.2d at 509, 512).

Obviously Micro Center cannot implement that system to serve as a thin veil for impermissible discrimination. And so Lopez' subjective beliefs might parallel a reasonable inference of discrimination if only Hispanic or Mexican employees were being terminated (or if they were being disproportionately terminated) for like violations (<u>Flores</u>, 182 F.3d at 516-17; <u>Sattar v. Motorola, Inc.</u>, 138 F.3d 1164, 1170 (7th Cir. 1998)). But the evidence is to the contrary: Micro Center terminates employees for violating the markdown policy when (using the discretion

18

properly reserved in its disciplinary policy) it deems any
employee's breach to be sufficiently egregious.  For example, two
other employees terminated for such breaches have been Bob
Fluegge and Eric Sarbaugh (both non-Hispanic)(MC. St. ¶¶126-31).

In sum, Lopez has failed to create a genuine issue of
material fact that can keep him in court as to one prong of his
prima facie case--that similarly situated non-Hispanics or non-
Mexicans were treated more favorably than he was treated.  And
that failure as to a vital component of his claim calls for the
entry of summary judgment in Micro Center's favor (Peele, 288
F.3d at 331).

With that said, one final (and related) point should be
made.  This Court expresses no view, nor would it be appropriate
to do so, as to whether the sanction imposed for Lopez'
infraction might perhaps be perceived by some observers as more
severe than the infraction justified--that judgment is for
employers and not courts to make (Stewart v. Henderson, 207 F.3d
374, 378 (7th Cir. 2000)).  What controls instead is that, even
with the benefit of favorable inferences, Lopez has not generated
a genuine factual issue as to whether his discharge was motivated
by discrimination--either by showing that Micro Center's
justification is a pretext for discrimination or otherwise
(Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147
(2000); Millbrook v. IBP, Inc., 280 F.3d 1169, 1174 (7th Cir.

2002)).

## Conclusion

What this opinion's painstaking review has clearly disclosed
is that the circumstances that Lopez has proffered in an effort
to prove his claim do not begin to raise a genuine issue of
material fact as to whether Micro Center's actions were linked to
discrimination on account of Lopez' race or national origin or
both. Lopez' claim ultimately fails, not because Micro Center
was indisputably correct in its decision but because he has not
offered sufficient evidence to suggest that it was impermissibly
discriminatory in its decision.

Micro Center is therefore entitled to a judgment as a matter
of law. Its Rule 56 motion is granted, and this action is
dismissed.

Milton I. Shadur
Senior United States District Judge

Date: November 14, 2003

Statement of: Armando Lopez

One day at the begining of the month of January an asociat Gerald
ask me to mark a yellow tag product #965343 priced original at
49.99. By mastake and cause I was Bussy with other customers at
the time I marked at 25.95 buy mastake. I then lefted at the
coonter an look away don't know if the same associat or other
moow it to the bin or other but this hapen not on the 1st it
hapen on in arrount the midle of the Month. Not the date of it
was mark by 1/1/01 but arround the midle of month

I agree I made a mastake but the situation in wish I was woorking
i was hacktic, bussy. I allways do many thing at the same time
and that could be the situation

I'm sorry but it have many things to do about to the day to
remember evry detail.